CHESTER A. SOUTHER AND MRS. CHESTER A. SOUTHER, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

JOHN BROOK JACKSON AND ALICE F. JACKSON, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

RICHARD H. GRANT, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 80485, 91700, 91701. Promulgated January 25, 1939.

198

*Joseph B. Coolidge, Esq.*, and *Prewitt Semmes, Esq.*, for the petitioners.

*Chester A. Gwinn, Esq.*, for the respondent.

OPINION.

TURNER: The major issue herein, common to all three proceedings, is whether the Motors Securities class A stock acquired by the petitioners on December 29, 1930, upon surrender of their Managers stock in liquidation was acquired pursuant to a plan of reorganization within the meaning of section 112 of the Revenue Act of 1928 so that the basis to the petitioners for determining gain or loss upon its subsequent disposition was the same as the basis of the stock in Managers exchanged therefor. Sec. 113 (a) (6), Revenue Acts of 1932 and 1934.

Prior to the transaction on December 29, 1930, counsel for Managers submitted to the Commissioner of Internal Revenue a proposed plan whereby Managers would transfer to Motors Securities all of its assets, receiving therefor all of a special class of stock to be authorized by Motors Securities, which said stock would be distributed

to the stockholders of Managers and Managers would thereupon be dissolved. It was further proposed that Motors Securities should offer to retire the whole or any part of the special issue of stock by exchanging therefor a corresponding amount of the common stock of General Motors. A ruling was requested as to whether or not the execution of the proposed plan would result in a reorganization within the meaning of the income tax statute. Under date of November 28, 1930, the ruling of the Bureau of Internal Revenue was transmitted to counsel for Managers, holding that the proposed transaction would "fall within the scope of section 112 (b) (3), (4) and (i) of the Revenue Act of 1928, concerning exchanges in connection with corporate reorganizations" and that no gain or loss would be recognized for income tax purposes. It was further stated, however, that any subsequent exchange, by the former stockholders of Managers, of the Motors Securities stock so acquired for General Motors common stock would result in gain or loss for income tax purposes, measured by the difference between the basis of the General Motors Securities Co. stock in the hands of the former stockholders of the Managers Securities Co. and the fair market value of the General Motors Corporation common stock as of the date of the exchange. The plan as proposed and ruled upon, subject to minor changes not here important, was carried out on December 29, 1930, and the petitioners in exchange for their stock in Managers received Motors Securities class A stock as follows: Grant, 80,567 shares; Jackson, 13,527 shares; and Souther, 19,228 shares.

In one or more of the taxable years under consideration each petitioner surrendered to Motors Securities shares of its class A stock, acquired as indicated above, and received shares of General Motors common stock. In making their returns the petitioners treated the exchange between Managers and Motors Securities on December 29, 1930, as a reorganization, in accordance with the ruling of the Bureau of Internal Revenue, and for the taxable years herein used an aliquot portion of the cost of Managers stock as the basis for determining the gain realized upon the surrender of the said class A stock for General Motors common stock. The petitioners now claim that the treatment of the transaction of December 29, 1930, as a statutory reorganization resulted from a mutual mistake of law and that for the purpose of determining the basis to petitioners for the class A stock acquired in that transaction the ruling and subsequent treatment of the transaction as a reorganization should now be disregarded. They contend that the distribution of the Motors Securities class A stock to them as stockholders of Managers was not pursuant to a plan of reorganization but was in liquidation of Managers, nothing more, the gain from which was recognizable when the distribution was made

in 1930, and that the basis of the Motors Securities class A stock in their hands was $34.25 per share, its fair market value when distributed, and not the cost to them of their stock in Managers.

The respondent, on the other hand, contends that the exchange between Managers and Motors Securities on December 29, 1930, was a statutory reorganization and that the said class A stock, having been distributed pursuant to the plan of reorganization, took the same basis for gain or loss purposes as the Managers stock surrendered therefor. He further claims and has pleaded in his answers that, since petitioners in past years have joined with him in treating the exchange of December 29, 1930, as having been made pursuant to a plan of reorganization, they may not now change their position and claim that it was otherwise for the purpose of procuring a stepped-up basis for their Motors Securities class A stock.

With respect to the issue above stated it is stipulated that, if the Motors Securities class A stock received by the petitioners in 1930 was acquired pursuant to a plan of reorganization, the basis for determining the gain realized upon the exchange of the class A stock for General Motors common stock is as follows: Richard H. Grant, 46.545 cents per share; John Brook Jackson, 55.662 cents per share; and Chester A. Souther, approximately 26 cents per share, the exact amount being that used by him in making his return and by the respondent in determining the deficiency against him. It is also stipulated that if the petitioners are entitled to a stepped-up basis, as contended by them, the basis for the Motors Securities class A stock is $34.25 per share, its fair market value at the time of distribution on December 29, 1930, and further that if Jackson and Grant are entitled to use the basis of $34.25 there are no deficiencies in their income tax for the years in controversy.

Under section 113 (a) (6) of the Revenue Act of 1928 the basis for determining the gain or loss from the exchange of property is the same as that of the property exchanged if the property acquired "was acquired upon an exchange described in section 112 (b) to (e)." To the same effect and in substantially the same language are the corresponding sections of the Revenue Acts of 1932 and 1934. Section 112 (b) (3) of the Revenue Act of 1928 provides that "No gain or loss shall be recognized if stock or securities of a corporation, a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization."

Certainly there can be no question that the exchange by the petitioners on December 29, 1930, of their Managers stock for Motors Securities class A stock was pursuant to a plan which was regarded, and up to the time of these proceedings had been treated, as a plan of

reorganization within the meaning of section 112 (i) (1) of the above act, which reads as follows:

SEC. 112. RECOGNITION OF GAIN OR LOSS.

\*     \*     \*     \*     \*     \*     \*

(i) *Definition of reorganization.*—As used in this section and sections 113 and 115—

(1) The term "reorganization" means (A) a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation, or substantially all the properties of another corporation), or (B) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its stockholders or both are in control of the corporation to which the assets are transferred, or (C) a recapitalization, or (D) a mere change in identity, form, or place of organization, however effected.

Our first question then is whether the plan under which the transaction of December 29, 1930, between Managers and Motors Securities was executed was a reorganization within the meaning of the statute. Both the petitioners and the respondent direct their arguments exclusively to the applicability of the definition contained in clause (A). The petitioners claim that the transaction did not "genuinely partake of the nature of a merger or consolidation" as the terms merger and consolidation, appearing in clause (A) above, were construed by the Supreme Court in *Pinellas Ice & Cold Storage Co.* v. *Commissioner*, 287 U. S. 462, and *Helvering* v. *Minnesota Tea Co.*, 296 U. S. 378, and further that Motors Securities did not acquire substantially all of the assets of Managers. Finally the petitioners contend that the transaction served no business purpose whatever, tax avoidance being the sole concern of the parties, and for that reason the transaction may not under *Gregory* v. *Helvering*, 293 U. S. 465, be treated as a reorganization within the meaning of the statute.

After quoting from *Helvering* v. *Minnesota Tea Co.*, *supra*, to the effect that the "seller" must acquire an interest in the affairs of the "purchasing company" more definite than the interest incident to the ownership of its short term purchase money notes and that the interest *so acquired must represent a substantial part of the value of the thing transferred*, it is argued that Managers acquired "*no* interest in the affairs of Motors Securities." The reasoning seems to be that the "interest" of Managers was the same before and after the exchange and therefore it acquired no "interest" in Motor Securities by reason of the exchange of the 290,310 shares of General Motors common stock and 148,509 shares of Motors Securities common stock for 4,509,060 shares of Motors Securities class A stock. In considering the effect of the exchange petitioners say they are ignoring the 290,310 shares of General Motors common stock for the reason that they amounted

to less than 6 percent of Managers assets transferred to Motors Securities and could in no wise affect the principles involved.

Although the petitioners make no contention that the 148,509 shares of Motors Securities common stock and the 290,310 shares of General Motors common stock did not constitute substantially all of the assets of Managers, and even though, according to stipulation, the said shares were in fact transferred to Motors Securities on December 29, 1930, in exchange for 4,509,060 shares of Motors Securities class A stock, petitioners claim, citing *Arctic Ice Machine Co.*, 23 B. T. A. 1223, that Motors Securities did not acquire substantially all of Managers assets but "merely took with one hand certain stock certificates and with the other handed back certain certificates the exact equivalent of those delivered to it", which at best was a reclassification by Motors Securities of its 148,509 shares of common stock. The petitioners' argument on each and every point seems to spring from the fact that the major portion of assets transferred to Motors Securities for its class A stock was likewise the stock of Motors Securities, even though the stock so transferred was common stock as distinguished from the class A stock acquired and the rights of Managers as a stockholder of Motors Securities was changed thereby. The essence of the argument seems to be that no corporation the principal asset of which was the stock of another corporation can merge with the latter corporation, and further, that the latter corporation can not be said to have acquired substantially all of the assets of the former corporation within the meaning of clause (A) above if it issues in exchange its own stock, even though the stock so issued is of a different class and the rights of the holders are materially changed.

In *H. B. Leary, Sr.*, 34 B. T. A. 1206, involving a transaction substantially similar to the transaction in the instant case, the respondent advanced the same arguments as those advanced here by the petitioners. In that case it was decided to eliminate a corporation the sole function of which was the holding of a majority of the common stock of another corporation. The stock so held, which was no par value voting stock, and some cash were transferred to the second corporation for $5 par value common stock, with added voting rights, and bonds of the latter. The new stock and bonds so acquired were distributed to the stockholders of the holding corporation and the holding corporation was dissolved. We held that the transaction was a reorganization within the meaning of clause (A) above, and upon review we were affirmed by the United States Circuit Court of Appeals for the Fourth Circuit, 93 Fed. (2d) 826. The court said:

The New York company undoubtedly acquired substantially all the properties of the Maryland corporation and immediately reissued its own stock in exchange therefor. The interest of the stockholders of the Maryland corporation in the business owned by the New York company and the Maryland corporation, the

holding company, remained, with but slight change, in the property owned by the New York company after the plan was carried out. It seems clear that such a situation results, in its legal effect, in a reorganization within not only the letter but the spirit of the taxing statute and brings the transaction within that class which Congress plainly intended not to tax until the stockholder finally disposed of his stock and his profit was definitely ascertainable. There was no change in the taxpayer's position with respect to the ownership of the property but merely a change in the form of the stock certificates held by him.

There was, in substance, a merger of the two companies. "A merger ordinarily is an absorption by one corporation of the properties and franchises of another whose stock it has acquired. The merger corporation ceases to exist, and the merging corporation alone survives." *Cortland Specialty Company et al.* v. *Commissioner of Internal Revenue,* 60 F. (2d) 937.

It would be hard to more accurately describe what happened in the instant case.

\*          \*          \*          \*          \*          \*          \*

The continuity of interest frequently held by the courts to be necessary in a reorganization (*Cortland Specialty Company* v. *Commissioner, supra; C. H.* *Mead Coal Co.* v. *Commissioner, supra*), was present here. The taxpayer held practically the same interest in the property after the plan was carried out that he held before.

In *Helvering* v. *Schoellkopf,* 100 Fed. (2d) 415, affirming the opinion of the Board reported at 35 B. T. A. 855, the United States Circuit Court of Appeals for the Second Circuit considered the same transaction that was involved in *H. B. Leary, Sr., supra.* The court, contrary to the conclusion reached by the Board and the United States Circuit Court of Appeals for the Fourth Circuit, took the position that the New York corporation, when it acquired its own shares of no par value common stock in exchange for its $5 par value common stock with added voting rights, did not acquire substantially all of the properties of the Maryland corporation within the meaning of clause (A) of the statutory definition of a reorganization, stating as a reason for the conclusion reached that the shares of stock so acquired "are merely extinguished" and "cannot properly be regarded as property acquired", and further, that the two issues of stock were so much alike as to be substantially the same so that the New York corporation was in effect under contract to return the shares to the Maryland corporation and therefore "did not acquire them." The court did hold, however, that the transaction was a reorganization, under clause (B) of the definition above, and that the liquidation of the Maryland corporation, the holding corporation, was pursuant to the plan of reorganization and its stockholders did not realize taxable gain thereby. To the same effect is *Commissioner* v. *Kolb,* 100 Fed. (2d) 920, decided by the United States Circuit Court of Appeals for the Ninth Circuit.

In the instant case the difference in the rights under the Motors Securities common stock and the Motors Securities class A stock was more definite and pronounced than the difference between the

two issues of common stock in *H. B. Leary, Sr.*, *supra*, and *Helvering* v. *Schoellkopf, supra.* As we read the opinion of the court in the latter case, however, the added difference between the two issues of stock in the instant case would not be sufficient, in the opinion of that court, to bring the exchange on December 29, 1930, between Managers and Motors Securities within the provisions of clause (A) of the definition of reorganization. Since the decision in *Helvering* v. *Schoellkopf, supra*, was rendered we have carefully reconsidered the applicability of clause (A) to transactions such as we have before us and with due deference to the views of the court expressed in its opinion therein, we adhere to the ruling in *H. B. Leary, Sr., supra*, in which we were affirmed, as stated above, by the United States Circuit Court of Appeals for the Fourth Circuit, and hold that the exchange on December 29, 1930, between Managers and Motors Securities falls within the scope of clause (A) of the statutory definition.

Regardless, however, of the applicability of clause (A) to the exchange between Managers and Motors Securities, we are of the opinion that clause (C) of the statutory definition, which defines the term "reorganization" as a recapitalization is applicable and the exchange was a reorganization thereunder. In *Mead Coal Co.* v. *Commissioner*, 72 Fed. (2d) 22, the court said: "It will thus be seen that the general purpose of all these reorganizations provisions was the same, not merely to remove the impediment to corporate readjustments, but also to prevent the recognition of purely fictitious gains or losses in the administration of the income tax law." As the petitioners suggest in their brief, the exchange of the Motors Securities common stock for class A stock at the best resulted in a reclassification of Motors Securities stock. Managers did not by that exchange actually liquidate its holdings but, as the court further suggested in *Mead Coal Co.* v. *Commissioner, supra*, continued "to be a participant in the enterprise without actual realization of profit." Such a reclassification must, in our opinion, be regarded as "a recapitalization" and therefore a reorganization under clause (C). *Kistler* v. *Burnet*, 58 Fed. (2d) 687; *H. E. Muchnic, Administrator*, 29 B. T. A. 163; *Walter F. Haass*, 29 B. T. A. 900; *H. Y. McCord*, 31 B. T. A. 342; and *Lelia S. Kirby*, 35 B. T. A. 578.

The remaining contention of the petitioners with respect to the transaction of December 29, 1930, is that it served no business purpose, tax avoidance being the sole concern of the parties, and even though it was a reorganization in form it was not, under *Gregory* v. *Helvering*, 293 U. S. 465, a reorganization within the meaning and intent of the statute. If the rule laid down in *Gregory* v. *Helvering* is to be strictly applied, numerous distinctions between that case and the instant case

immediately suggest themselves, but in our opinion, the distinction here need not be drawn on a restricted or narrow basis. It is true that avoidance of tax was a major concern of the parties in interest, but, as the Supreme Court pointed out, tax avoidance "will not alter the result or make unlawful what the statute allows." The claim that tax avoidance was the sole or only purpose served is, in our opinion, definitely refuted by the facts of record.

It is to be noted at the outset that, while Managers when it was organized was endowed with broad and general powers customary in the organization of modern corporations, it was in fact organized for the single purpose of acquiring and holding directly or indirectly stock of General Motors and of distributing the profits therefrom to its stockholders, who were to be selected by the General Motors Corporation from among its officials. By this plan General Motors hoped to arouse added interest in its affairs in the executives who had been responsible for its success and through their ownership of stock in Managers to insure continued successful management in the future. To furnish the means for acquiring the General Motors stock to be owned and held by Managers directly or indirectly, General Motors entered into a contract with Managers whereby it agreed to pay to the latter a percentage of its earnings over a period of approximately seven years. For approximately the same period General Motors, through an irrevocable option to repurchase the stock in Managers allotted to and acquired by its officials, retained the power to limit participation in the plan to the officials selected by it. Pursuant to the plan Managers immediately after its organization paid cash and its entire issue of preferred stock for 30 percent of the common stock of Motors Securities, a second holding company, the sole assets of which consisted of General Motors common stock.

By April 1927 all of the preferred stock used in the purchase of the Motors Securities stock had been retired and on December 31, 1929, the agreement by General Motors to pay over a part of its earnings to Managers was terminated. There being no further direct participation in the earnings of General Motors and Managers being almost wholly dependent for profit on the General Motors common stock held and owned by Motors Securities, the continued existence of Managers separate and apart from Motors Securities was to an obvious extent no longer essential or expedient, unless it should be decided that its activities should be enlarged and extended. A questionnaire was accordingly submitted by Managers to its stockholders in its efforts to determine the course to be followed. Of the 74 stockholders owning the 40,000 shares of class B stock outstanding, 50, representing a majority of the stock, expressed a desire to expand the activities of Managers into an investment trust; 12 desired to continue the

company as it was; others expressed no preference; and 11 indicated a possible desire to liquidate their holdings so that they might acquire and own directly their ratable portion of General Motors common stock.

After careful study, the suggestion that Managers be extended into an investment trust was abandoned. Under those circumstances the continued existence of Managers served no useful business purpose, but as it was then constituted its dissolution would force upon some stockholders an undesired liquidation and at the same time would not enable those who might desire to liquidate to acquire and own directly their ratable portions of General Motors common stock. It is thus apparent that the plan devised and executed was prompted not only by a motive of tax avoidance, but for the purpose of providing a means whereby those stockholders who preferred to maintain their investments in a holding company might do so, while others might liquidate and acquire the direct ownership of General Motors common stock if they so desired. In this connection it is noted that more than two million of the class A shares were still outstanding on December 31, 1935. Certainly on these facts it can not be said, as it was in *Gregory* v. *Helvering*, *supra*, that "the whole undertaking * * * was in fact an elaborate and devious form of conveyance masquerading as a corporate reorganization and nothing else." To again utilize the thought expressed by the court in *Mead Coal Co.* v. *Commissioner*, *supra*, the stockholders of Managers did "not actually liquidate" their holdings upon the exchange of their Managers stock for Motors Securities class A stock, but continued "to be a participant in the enterprise without actual realization of profit." Under the circumstances here the liquidation actually occurred when in subsequent years the petitioners surrendered their Motors Securities class A stock for General Motors common stock and withdrew from the enterprises of the respective holding companies.

It is, of course, true that the organization and maintenance of a pure holding company do not ordinarily serve a business purpose comparable to the purposes of commercial, industrial, trading, or financial organizations and similarly a difference in business purpose exists in the reorganization of a holding company. But where the purposes which prompt the organization of a holding company in the first instance are inherent in the reorganization of such company and the plan followed is within the wording of the statute, there is, in our opinion, no basis or ground for applying the doctrine of *Gregory* v. *Helvering*, *supra*, to such a reorganization and to hold, as the petitioners here contend, that it was solely a device to avoid tax. To so conclude would be to imply that a holding company has no standing under the income tax statutes separate and apart from its stockholders.

In our opinion the statute applicable here is not susceptible of any such construction.

Having determined that the exchange between Managers and Motors Securities on December 29, 1930, was a reorganization within the meaning of the income tax act and the exchange by the petitioners of their stock in Managers for Motors Securities class A stock was pursuant to the plan of reorganization, it becomes unnecessary to consider the issue raised by the respondent in his answers to the effect that the petitioners, having joined with him in treating the transaction of December 29, 1930, as a reorganization, may not now change their position and claim that it was otherwise for the purpose of procuring a stepped-up basis for their Motors Securities class A stock. The respondent is accordingly sustained in his determination that the basis of the Motors Securities class A stock in the hands of the petitioner was the cost to them of their stock in Managers exchanged therefor.

Petitioners Jackson and Grant contend in the alternative that the gain realized by them in 1934 and 1935 upon the surrender of Motors Securities class A stock for General Motors common stock is to be recognized only to the extent prescribed by section 117 of the Revenue Act of 1934 [1] and is not to be recognized in full under the provisions of section 115 (c) [2] as gain resulting from a distribution in partial liquidation of Motors Securities. The parties have stipulated that if petitioner Jackson is entitled to the benefit of the capital gains provisions of section 117, *supra*, there is no deficiency in his income tax for that year and if the petitioner Grant is entitled to such benefits for

---

[1] SEC. 117. CAPITAL GAINS AND LOSSES.

(a) GENERAL RULE.—In the case of a taxpayer, other than a corporation, only the following percentages of the gain or loss recognized upon the sale or exchange of a capital asset shall be taken into account in computing net income:

100 per centum if the capital asset has been held for not more than 1 year;

80 per centum if the capital asset has been held for more than 1 year but not for more than 2 years;

60 per centum if the capital asset has been held for more than 2 years but not for more than 5 years;

40 per centum if the capital asset has been held for more than 5 years but not for more than 10 years;

30 per centum if the capital asset has been held for more than 10 years.

\*　　\*　　\*　　\*　　\*　　\*　　\*

(c) DETERMINATION OF PERIOD FOR WHICH HELD.—For the purpose of subsection (a)—

(1) In determining the period for which the taxpayer has held property received on an exchange there shall be included the period for which he held the property exchanged, if under the provisions of section 113, the property received has, for the purpose of determining gain or loss from a sale or exchange, the same basis in whole or in part in his hands as the property exchanged.

[2] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

\*　　\*　　\*　　\*　　\*　　\*　　\*

(c) DISTRIBUTIONS IN LIQUIDATION.—Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. \* \* \* Despite the provisions of section 117 (a), 100 per centum of the gain so recognized shall be taken into account in computing net income. \* \* \*

1934 and 1935, there is no deficiency in his income tax for 1935 and no deficiency for 1934 except that resulting from the disallowance of a deduction as interest paid in the amount of $2,581.94.

The contention of the petitioners that the General Motors common stock acquired upon surrender to Motors Securities of shares of its class A stock was not acquired as a distribution by Motors Securities in partial liquidation within the meaning of section 115 (c), *supra*, seems to rest upon the fact that under the terms of issue the holders of Motors Securities class A stock had the right on 90 days' notice and during the period prior to January 1, 1934, to surrender up to 80 percent of their holdings of the class A stock and receive therefor an equal number of shares of General Motors common stock from Motors Securities class A asset account, and had the further right at any time after January 1, 1934, to similarly surrender the remaining 20 percent of their class A stock for General Motors common stock. The petitioners argue that such distributions of General Motors common stock for the said class A stock were in satisfaction of contractual obligations and not distributions in partial liquidation of Motors Securities.

Section 115 (i) of the Revenue Act of 1934 defines a partial liquidation as follows:

(i) DEFINITION OF PARTIAL LIQUIDATION. As used in this section the term "amounts distributed in partial liquidation" means a distribution by a corporation in complete cancellation or redemption of a part of its stock, or one of a series of distributions in complete cancellation or redemption of all or a portion of its stock.

We are unable to find any merit in the petitioners' contentions. They attempt to draw a comparison between the retirement of corporate bonds at maturity and the distribution here of General Motors common stock upon surrender of class A stock. The fundamental distinction between the rights of the holder of a bond and that of a stockholder, even though the stock held might be preferred or of a special class, is too well known to require discussion. The relationship is contractual in both cases, but in the case of a bond there is an obligation to pay in any event. In the case of a shareholder there is no such obligation and so long as the stockholder relationship exists the investment of the individual stockholder is subject to the hazards of the business and his rights, even though they may be preferred with respect to the rights of the holders of another class of stock, are secondary in so far as the rights of creditors are concerned. It is true that the holders of the class A stock could, as between them and the corporation, on 90 days' notice surrender the class A stock and demand an equal number of shares of General Motors common stock, but the presence of that option made them none the less stock-

holders up to the time the option was actually exercised. The presence of an option on the part of a corporation to retire preferred or special issues of stock is a very common thing, but the presence of such an option does not change the relationship between the corporation and the owners of the special issue of stock from a relation of corporation and stockholders to that of debtor and creditor. We see no basis whatever for any conclusion that the situation is any different where according to the terms of the issue the stockholders likewise have the option of surrendering the said stock in exchange for a pro rata share of the corporate assets. According to the statute, "amounts distributed in partial liquidation" means amounts distributed by a corporation in "complete cancellation or redemption of a part of its stock, or one of a series of distributions in complete cancellation or redemption of all or a portion of its stock." Here the distribution of General Motors common stock by Motors Securities in redemption and cancellation of its class A stock falls so obviously within the definition that further or extended discussion is, in our opinion, needless. On this point the respondent is sustained and the gain realized upon the acquisition of General Motors common stock through the surrender to Motors Securities of its class A stock is to be recognized in full in accordance with the provisions of section 115 (c), *supra.*

Grant and Jackson in their petitions allege that the application of the provisions of section 115 (c) of the Revenue Act of 1934 to gains realized through the acquisition of General Motors common stock upon the surrender of Motors Securities class A stock during the year 1934, but prior to May 10, 1934, when the Revenue Act of 1934 was signed by the President, was in violation of their rights under the Fifth Amendment to the Constitution. On brief the petitioners make no point and cite no authorities to support their claim of error so alleged. In any event, however, there is no merit in the claim. By the terms of the act, section 115 (c) became effective as of January 1, 1934. The respondent was merely applying the terms of the act as enacted by Congress and it is well established that an income tax statute is not unconstitutional merely because it is retroactive. *Brushaber* v. *Union Pacific Railroad Co.*, 240 U. S. 1; *Phipps* v. *Bowers*, 49 Fed. (2d) 996; certiorari denied, 284 U. S. 641; *Edgar Stanton et al., Executors*, 34 B. T. A. 451; affd., 98 Fed. (2d) 739.

A similar argument is made on brief with respect to the application of section 23 (r) of the Revenue Act of 1932 to losses sustained by petitioner Souther on the sale of General Motors common stock in 1932 but prior to the date of enactment of the Revenue Act of 1932. No such claim was made by Souther in his petition but, as we have pointed out with reference to a comparable claim with respect to

the provisions of the Revenue Act of 1934, there is no merit in the contention.

In the case of Chester A. Souther the petition contains some further allegations of error, the full purport of which is not entirely clear, and, inasmuch as no explanation or argument was offered in connection therewith, they will be regarded as abandoned.

Reviewed by the Board.

*Decision will be entered under Rule 50.*