## ALPERS v. COMMISSIONER OF INTERNAL REVENUE.
### No. 20.

Circuit Court of Appeals, Second Circuit.
Feb. 21, 1942.

L. HAND, Circuit Judge, dissenting.

Raymond B. Goodell, of New York City, for petitioner.

Samuel O. Clark, Jr., Asst. Atty. Gen., and J. Louis Monarch and Morton K. Rothschild, Sp. Assts. to Atty. Gen., for respondent.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

SWAN, Circuit Judge.

In 1935 the taxpayer realized a gain of $27,787 upon disposing of 20 shares of stock which he had held for more than 10 years. The question presented is whether such gain is taxable under section 117(a) of the Revenue Act of 1934, 26 U.S.C.A. Int.Rev.Acts, page 707, as gain resulting from the sale or exchange of a capital asset, in which case only 30 per cent. thereof is taxable, or whether it is taxable under section 115(c), 26 U.S.C.A. Int.Rev.Acts, page 703, as gain resulting from a distribu-

tion in partial liquidation of a corporation, in which case 100 per cent. is taxable. The Board held, sustaining the commissioner, that the transaction constituted a distribution in partial liquidation, to which section 115(c) is applicable.

The facts as found by the Board may be stated as follows: Ernest Alpers, the petitioner, acquired 20 shares of stock of General Drafting Company, Inc., a New York corporation, in 1921. Its cost basis to him was zero. The rest of the issued and outstanding stock, 180 shares, was owned by Otto G. Lindberg, president of the corporation. In 1935 Lindberg, desiring to own all the outstanding stock, asked Alpers if he would be willing to sell his 20 shares and Alpers consented to do so. They agreed upon a price of $27,787, which was approximately the book value of Alpers' stock. As Lindberg did not have the money to pay for it, the company's money was used in consummating the transaction. Alpers transferred his 20 shares to the company and received its check for $27,787. Federal and state transfer taxes were paid on the transfer. Alpers thought he was selling the stock to Lindberg and Lindberg thought the same. No corporate action was taken by either stockholders or directors of the company to authorize or ratify the transaction, and no certificate of reduction of shares was filed with the Secretary of State of New York under section 36 of the New York Stock Corporation Law. The company's bookkeeper asked Lindberg how the transaction should be entered on the books. Inexperienced in bookkeeping, he told her to use her best judgment and to consult the accountant who checked the company's books. The accountant directed that the books reflect it as a retirement of stock; and an entry was made to that effect, $2,000 being charged against capital and $25,787 against surplus. Lindberg fastened the certificate for the 20 shares received from Alpers to the issuance stub in the company's stock certificate book and wrote across it the word "cancelled." He regarded the stock as having come back into his possession. No other certificate was issued in lieu of the 20 shares. There was no account for treasury stock on the books of the company. Lindberg had no intention of curtailing the business or liquidating it in part; in fact the business of the company expanded after the acquisition of Alpers' 20 shares.

Section 117(a) of the Revenue Act of 1934 lays down the general rule as to the percentages of gain or loss recognized "upon the sale or exchange of a capital asset" to be taken into account in computing net income; and specifies 30 per cent. if the capital asset has been held more than 10 years. This clearly covers the Alpers sale unless section 115(c) excludes such a transaction from the general rule. Section 115 (c) provides: "(c) Distributions in Liquidation. Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. The gain or loss to the distributee resulting from such exchange shall be determined under section 111, but shall be recognized only to the extent provided in section 112. Despite the provisions of section 117(a), 100 per centum of the gain so recognized shall be taken into account in computing net income. * * *" Except for the last sentence above quoted, provisions substantially the same have appeared in each of the prior revenue acts beginning with the Act of 1924.[1] The purpose of inserting the last sentence, as explained in the congressional committee reports,[2] was to subject to surtax rates the gain resulting from distributions in liquidation. Under the prior acts a distribution in liquidation was treated in the same manner as a sale of stock; that is, any gain realized was subject to the flat capital gain rate of 12½ per cent. if the shareholder had held his stock for more than two years, while if the corporation distributed its surplus as an ordinary dividend the amount received was subject to surtax rates in the hands of the shareholder. Under the 1934 Act the flat capital gain rate was abolished. In the case of a sale or exchange of a capital asset only a percentage of the gain (de-

---

[1] Sec. 201(g), Revenue Act of 1924, 43 Stat. 255, 26 U.S.C.A.Int.Rev.Acts, page 3; Sec. 201(h), Revenue Act of 1926, 44 Stat. 11, 26 U.S.C.A.Int.Rev.Acts, page 147; Sec. 115(h), Revenue Act of 1928, 45 Stat. 823, 26 U.S.C.A.Int.Rev.Acts, page 385; Sec. 115(h), Revenue Act of 1932, 47 Stat. 204, 26 U.S.C.A.Int.Rev. Acts, page 521.

[2] H.Rep. No. 704, 73d Cong. 2d Sess. p. 29; S.Rep. No. 558, 73d Cong. 2d Sess. p. 37.

pending on how long the capital asset had been held) was to be included in computing net income, while in the case of a distribution in liquidation, the entire gain was to be included and thus be subjected to both normal and surtax.

■ Determination of whether the payment to Alpers was an amount distributed in partial liquidation of the corporation, must be made in accordance with the definition of partial liquidation found in section 115(i), which reads: "As used in this section the term 'amounts distributed in partial liquidation' means a distribution by a corporation in complete cancellation or redemption of a part of its stock, or one of a series of distributions in complete cancellation or redemption of all or a portion of its stock." 26 U.S.C.A. Int.Rev. Acts, page 704. In the light of this definition the Board and the courts have made a distinction between acquisition by a corporation of its own stock for the purpose of retiring it, that is, for "complete cancellation or redemption," and acquisition for the purpose of holding it as "treasury stock" until reissued. Acquisitions of the first type are within section 115(c). Hammans v. Commissioner, 2 Cir., 121 F.2d 4; Amelia H. Cohen Trust v. Commissioner, 3 Cir., 121 F.2d 689; Britt v. Commissioner, 40 B.T.A. 790, affirmed 4 Cir., 114 F.2d 10; Souther v. Commissioner, 39 B.T.A. 197. Purchases of the second type are not, and the gain resulting therefrom is taxable under section 117(a). William A. Smith v. Commissioner, 38 B.T.A. 317; W. C. Robinson v. Commissioner, 42 B.T.A. 725. Both of these cases were cited with apparent approval in the Amelia H. Cohen Trust case, supra. See also Hord v. Commissioner, decided by the Board November 5, 1941, C.C.H.Dec. 12168B. From the standpoint of congressional policy the relevancy of the distinction is not obvious. In each case the taxpayer parts with his stock and receives from the issuing corporation a portion of its surplus. It is not easy to see why Congress should wish the rate of tax to which his gain is subjected to depend upon whether or not the corporation retains the power to reissue the stock as "treasury stock." Conceivably the reason may be found in the fact that the corporation's acquisition of the stock with a view to reissuing it indicates that there was no intention on its part permanently to distribute part of its surplus; hence the characteristics of a sale may be

thought to predominate over the characteristics of a distribution in partial liquidation and it may be fair to tax the shareholder on the same basis as when he sells to a purchaser other than his own corporation. In any event the respondent has made no contention that the distinction between retired stock and treasury stock is not justified by the statute, and we shall assume that it is.

■ The question then comes down to whether the Board's conclusion that Alpers' stock was "completely cancelled" is correct. We do not think it is. Since section 36 of the New York Stock Corporation Law was not complied with, the power to reissue the shares continued to exist. The failure to carry them as treasury stock on the books does not affect that power; nor does the writing of "cancelled" on the certificate. Legally the shares were not "completely cancelled." While conceding that there was no statutory retirement of the stock under New York law, the respondent contends that there was "a retirement for all practical purposes" and argues that this should be sufficient since the operation of section 115 is not expressly or by implication made to depend on the state law. See Lyeth v. Hoey, 305 U.S. 188, 194, 59 S.Ct. 155, 83 L.Ed. 119, 119 A.L.R. 410. But even on the assumption that there might be a "complete cancellation" for federal tax purposes without compliance with the state law as to retiring the shares, the facts found by the Board do not justify the conclusion that the stock was acquired for the purposes of cancellation. The character of the transaction must be judged by what occurred when the petitioner surrendered his certificate in exchange for payment. It is stipulated that his shares were transferred to the corporation but we can see nothing to indicate that when it acquired them it had then the intention to retire them. The intent attributable to the corporation must be Lindberg's intent for he alone acted for it in the transaction. The Board found that Alpers "thought that he was selling his stock to Lindberg and Lindberg thought the same." While they were mistaken as to the legal effect of their acts, their belief that the stock was being sold demonstrates that Lindberg at the time had no idea that the stock was being acquired for retirement by the corporation. This is further substantiated by the finding that "he regarded the stock as having come back into

his possession." The idea of retirement was first suggested by an accountant's advice to the company's bookkeeper at some unspecified date after its acquisition of the shares. We do not think that a subsequently formed intention to retire stock purchased by a corporation can convert its payment of the purchase price into "a distribution by the corporation in complete cancellation or redemption of a part of its stock" so as to affect the tax liability of the shareholder who sold, even on the assumption that formal compliance with the state law as to retirement is unnecessary.

Order reversed.

L. HAND, Circuit Judge (dissenting).

Sections 115(c) and 115(i) withdraw the partial exemption from taxation granted by § 117(a), when a corporation "completely liquidates" either the whole or a part of its shares. Apparently Congress feared that otherwise the shareholders might escape full taxation upon accumulated earnings. At any rate it makes no difference here what the purpose was, because, whatever it was, it as well includes a case where the company buys its own shares which thereby become "treasury shares," as one where the authorized capitalization is also reduced. So far as the shareholder is concerned, the first is as much a "liquidation" of his shares as the second; the only difference concerns the corporation alone, i. e., that "treasury shares" are treated, somewhat metaphysically, as though they still existed, and that to reissue them there is no need of restoring the authorized capital to what it was originally. Borg v. International Silver Company, 2 Cir., 11 F. 2d 147, 150. That difference ought not to be decisive unless the words used compel us to treat it so—particularly since we are dealing with an exemption. Therefore, I should regard it as irrelevant here if Lindberg and Alpers had actually "intended" a sale of the shares to Lindberg, but it does not seem to me that they did; they intended a sale to the corporation, and merely erroneously supposed that its legal effects were the same as a sale to Lindberg, because Lindberg was the only remaining shareholder.

As to the words used, they are in the alternative—"cancellation or redemption" —and we must assume that there is a difference in their meaning. I should agree that there would be strong, and perhaps conclusive, reason for saying that "treasury shares" were not "cancelled"; and I should also agree that "redeem" ordinarily also involves a cancellation; as for example when a company redeems a preferred issue. But it is a somewhat less formal word than "cancelled," and besides, as I have said, it ought to cover situations in which the shares are not "cancelled." For these reasons it appears to me that we do not do it too much violence to make it cover "treasury shares," which are—at least colloquially speaking—certainly "redeemed"; especially since, if we do not so construe it, the apparent purpose of the statute is not fully realized. The Board has decided otherwise on several occasions, and the reasoning in Amelia H. Cohen Trust v. Commissioner, 3 Cir., 121 F.2d 689, 691, assumed that the distinction was crucial, though the decision did not require such a holding; but I cannot agree, and therefore I think the order should be affirmed.