John M. Hathaway v. Commissioner.
Hathaway v. Commissioner
Docket No. 3875.
United States Tax Court
1945 Tax Ct. Memo LEXIS 161; 4 T.C.M. (CCH) 646; T.C.M. (RIA) 45215; June 16, 1945
John M. Hathaway, pro se. Charles P. Reilly, Esq., for the respondent. ARNOLD Memorandum Opinion ARNOLD, Judge: This proceeding involves an income tax deficiency for 1940 of $755.41. The sole issue is whether petitioner sold 552 shares of stock to the corporation that issued it, or received a distribution in partial liquidation from such corporation within the meaning of section 115 (c), Internal Revenue Code. [The Facts] The facts as stipulated are adopted as our findings of fact. Certain additional facts are found from exhibits admitted without objection at the hearing. The petitioner filed his return for the taxable year with the collection district of Massachusetts. In 1940 petitioner was president of Hathaway Oil Co., Inc., hereinafter referred to as the corporation, a Massachusetts corporation, with principal office in New Bedford, Massachusetts. The purpose for which the corporation *163 was formed was to buy, sell and trade in petroleum and in any and all of its by-products. The authorized capital, when the charter was granted on October 15, 1921, was 300 shares of common stock, par value $100 per share. On December 12, 1922, the authorized capital was increased to 1,500 shares of common, or a total capitalization of $150,000. No other class of stock was ever authorized or issued. On June 13, 1940, petitioner owned 552 shares of the 1,500 shares outstanding, which shares had cost him $61,050. Printed on the face of each stock certificate were the following pertinent provisions: "Any member of this Corporation who shall be desirous of selling any of his shares, * * * shall give notice in writing to the Board of Directors addressed to the President of this Corporation at the regular place of business of the Company that he will sell such shares to any member of the Board of Directors of this Corporation who may desire to purchase the same at the book value thereof * * *, and such offer shall be submitted to the Board of Directors at the meeting next succeeding the receipt of the same." A director had seven days within which to accept the offer. If more than one director *164 accepted, the offering party could select the purchaser. If no director accepted the offer, the stockholder could sell to any person, or the Board could by vote permit the sale to any person selected by the party making the offer. On June 13, 1940, petitioner formally notified the board of directors of the corporation that - "In accordance with the by-laws of this corporation, I hereby offer to the Board of Directors (552) Five Hundred and fifty-two shares of the capital stock standing in my name." Accompanying the formal notice of his desire to sell said stock was an agreement of even date whereby he agreed to sell his 552 shares of stock in the corporation to R. Eugene or John S. Ashley (father and son) for the sum of $118,956, payable $18,956 in cash, and a $100,000 promissory note payable $100 per week, with interest at 4 percent payable semi-annually. The agreement specifically stated that "* * * this proposition is contingent on the proposed deal as outlined by the Treasurer in his report to the directors of this date, being consummated." On June 13, 1940, the treasurer of the corporation, R. Eugene Ashley, reported to the directors that after many days in conference *165 with representatives of the Gulf Oil Corporation of Pennsylvania, he had been unsuccessful in his effort to sell them all of the assets of the corporation. He reported that he had, however, finally succeeded in getting a proposition from them whereby Gulf would purchase the corporation's retail gasoline stations, including real estate, buildings and equipment, the Massachusetts Plant, land at Cook and Kempton streets, and certain dealer and commercial consumer equipment for the aggregate sum of $237,371.31. At a special meeting of the stockholders on June 27, 1940, the treasurer of the corporation was authorized to consummate sale of the assets specified in the treasurer's report of June 13, 1940, for the sale price of $237,371.31. The sale was consummated on July 10, 1940, and Gulf Oil Corporation took over the operation of the retail gasoline filling stations formerly operated by the corporation on July 15, 1940. On the latter date the corporation was appointed distributor for New Bedford and surrounding territory for Gulf Petroleum products. Prior thereto the corporation had been the distributor for New Bedford and surrounding territories for Shell Oil Company products. The corporation *166 announced to the public through newspaper advertisements that it would continue operation of the following departments: Heavy Fuel Oils Domestic Fuel Oils Oil Burner Division Oil Burner Service Department
Home Insulation Department Marine Department Marine Gasoline Lubricating Oils On October 1, 1940, R. Eugene Ashley and John S. Ashley assigned petitioner's agreement for sale of his stock to the corporation. On the same date the corporation voted to accept the assignment and to purchase from petitioner his 552 shares of stock in accordance with the terms of said agreement. On the same date petitioner delivered 11 certificates for his 552 shares of stock to the treasurer of the corporation. On the reverse side of each certificate appeared the following endorsement over the signature of the petitioner: "For value received I hereby assign the within certificate to the Hathaway Oil Co., Inc." Upon delivery of the certificates petitioner received from the corporation its promissory note for $100,000 and cash in the sum of $18,922.88, the cost of Massachusetts and internal revenue stock transfer stamps, affixed by the corporation's treasurer to the certificates, being *167 deducted from the sale price stipulated in the agreement. On October 1, 1940, six other stockholders, who had executed agreements to sell stock to R. Eugene Ashley and/or John S. Ashley, which agreements were assigned to and accepted by the corporation, likewise delivered their stock certificates aggregating 181 shares to the treasurer of the corporation. The other stock of the corporation stood in the names of two stockholders, R. Eugene Ashley, 510 shares, and John S. Ashley, 257 shares. As Massachusetts statutes require that a corporation shall have at least three directors and as the by-laws of the corporation prescribed stock ownership as a prerequisite to membership on the board of directors, it was voted that one of the aforementioned six stockholders be allowed to keep one share of stock and the treasurer was instructed to issue him one share so that he could continue serving as a director. The certificate of condition of the corporation for 1940, required by Massachusetts statutes, disclosed, in respect to the corporation's capital structure, $150,000 capital stock, with par value, of which $73,200 is shown as treasury stock. Certificates for the 732 shares shown as *168 treasury stock were not actually issued in the corporation's name. None of the 732 shares has ever been reissued. The certificate of condition of the corporation for the year 1939 disclosed $150,000 of capital stock outstanding and no treasury stock. In addition to the cash of $18,922.88 petitioner received during 1940, under the terms of the agreement for sale of his stock, 13 installment payments of $100 each. The sale of his stock was reported by petitioner in his 1940 return under the provisions of section 44, Internal Revenue Code, as the cash payments received by him in 1940 did not aggregate 30 percent of the contract price. The transaction was reported by petitioner as a long-term capital gain. The balance sheet of the corporation for 1940 appearing in schedule L of its income tax return for that year shows capital stock at the beginning of the year of $150,000 and $76,800 at the end of the year, and total assets and liabilities at the beginning and end of the taxable year as $599,592 and $376,925, respectively. Schedule M of the corporation's return shows "Prem. Pd. on Retired Stk. $84,560.64." In answer to question 9 (b) in said return, i.e. *169 , "did any corporation, individual, partnership, trust, or association own at any time during the taxable year 50 percent or more of your voting stock?" the corporation answered "Yes", which answer was explained as follows: "R. Eugene Ashley, 560 Cottage St. New Bedford, Mass. (Deceased) Owned 66.41% at date of death Jan. 6, 1941. Holdings were increased from 34% to 66.41% October 1, 1940 through retirement of 732 shares of capital stock of corporation. Returns filed at Boston, Mass." The respondent determined that the transaction was a partial liquidation within the purview of section 115 (c), Internal Revenue Code. The transaction between petitioner and the corporation was a sale. No part of the proceeds thereof constituted a distribution by the corporation in complete cancellation or redemption of a part of its stock. Upon the foregoing facts petitioner contends that he sold his 552 shares to the corporation and thereby realized a long-term capital gain, 50 percent of which is taxable under section 117, Internal Revenue Code. Respondent contends that the acquisition of petitioner's stock by the corporation constituted a partial *170 liquidation of the corporation under section 115 of the Code and that petitioner thereby realized a short-term capital gain which is 100 percent taxable under section 117. The Code defines "amounts distributed in partial liquidation" as a "distribution by a corporation in complete cancellation or redemption of a part of its stock," section 115 (i). The provisions of section 115 (c), pertinent hereto, state that "amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. The gain or loss to the distributee resulting from such exchange shall be determined under section 111, but shall be recognized only to the extent provided in section 112. Despite the provisions of section 117, the gain so recognized shall be considered as a short-term capital gain, except in the case of amounts distributed in complete liquidation." If, therefore, respondent is correct in his determination that the corporation's acquisition of petitioner's shares was a distribution in partial liquidation, the gain realized will be 100 percent taxable. In George F. Jones, 4 T.C. 854, 857, after setting forth the definition in section *171 115 (i), supra, we stated: * * * In determining whether a partial liquidation has taken place the controlling factor is the intent of the corporation in reacquiring its stock. If stock is purchased to be canceled and retired, the seller receives a distribution in partial liquidation; and the fact that he may not know it was purchased with this intention is immaterial. Hammans v. Commissioner, 121 Fed. (2d) 4; Cohen Trust v. Commissioner, supra [121 Fed. (2d) 689; Hill v. Commissioner, 126 Fed. (2d) 570; Benjamin R. Britt, 40 B.T.A. 799; affirmed upon other issues, 114 Fed. (2d) 10; Chester A. Souther, 39 B.T.A. 197; and Dill Manufacturing Co., 39 B.T.A. 1023. If stock is purchased to be held as treasury stock subject to resale, an ordinary capital transaction results. William A. Smith, 38 B.T.A. 317; W. C. Robinson, 42 B.T.A. 725; Dorsey Co. v. Commissioner, 76 Fed. (2d) 339; Alpers v. Commissioner, 126 Fed. (2d) 58. The stipulated facts contain no direct evidence regarding the corporation's intent in reacquiring its stock. We must ascertain such *172 intent from all the surrounding facts and circumstances, and particularly from what occurred when petitioner surrendered his stock in exchange for payment. See Alpers v. Commissioner, 126 Fed. (2d) 58, p. 60, and Harold F. Hadley, 1 T.C. 496. Respondent submits, as proof that the corporation intended a distribution in partial liquidation, the corporation's sale of a large portion of its business assets and withdrawal from the retail gasoline business, certain statements contained in the corporation's 1940 tax return regarding retirement of and premiums paid for its capital stock and changes in the percentage of stock ownership, and the absence of any evidence that the corporation intended to reissue the stock. We do not agree that these facts singly, or in the aggregate, establish an intent on the part of the corporation to make a distribution "in complete cancellation or redemption of a part of its stock." In our opinion the sale of the filling stations and the withdrawal of the corporation from this competitive field of endeavor in July, 1940, was for the purpose of permitting the corporation to concentrate its future efforts on the departments it publicly *173 announced by newspaper advertisements that it would continue to operate. This portion of respondent's argument is apparently directed at the alleged partial liquidation of the corporation's business. While there may have been a partial liquidation of the corporation's business, it is beside the point here, since the "statute applies, not to a distribution in liquidation of the corporation or its business, but to a distribution in cancellation or redemption of a part of its stock." Hamilton Allport, 4 T.C. 401, 403; see also William Cochran, 4 T.C. 942, promulgated March 7, 1945. The statements in the corporation's return were made almost six months after the transaction occurred. The statements are uncorroborated by any other evidence and a matter of actual fact are untrue since the stock was not retired but held in the treasury. It may be that by the time the corporation filed its 1940 tax return it had decided to cancel and redeem the shares acquired October 1, 1940. But "The character of the transaction must be judged by what occurred when the petitioner surrendered his certificate in exchange for payment," Alpers v. Commissioner, supra, p. 60, *174 and a subsequently formed intention to retire the stock purchased can not convert payment of the purchase price into a distribution in partial liquidation. Id. p. 61. The collateral statements in the corporate return respecting retirement of the stock do not prove that the corporation acquired the stock "in complete cancellation or redemption of a part of its stock." In view of the fact that the 1940 Certificate of Condition to the State of Massachusetts shows the stock purchased was held as treasury stock; in view of the fact that it is stipulated that none of the 732 shares has ever been reissued, which implies that the shares were capable of being reissued; in view of the fact that there has been no statutory reduction in the corporation's capital stock under sections 41 and 45, Chapter 156, General Laws of Massachusetts; and finally, in view of the fact that the corporation took no formal action through its stockholders or its directors for liquidation of its capital stock, we are of the opinion that petitioner sold his stock as alleged and the resulting gain should be taxed as a long-term capital gain. We do not agree with respondent that the burden of proof imposed *175 upon the petitioner requires him to prove that the corporation intended at some time to reissue the stock acquired. Once petitioner has established that the corporation did not acquire the stock with intent to cancel or redeem the same, we think he has proved his right to relief. Since the deficiency herein resulted from the adjustment hereinabove disapproved, a decision of no deficiency will be entitled. Decision will be entered for the petitioner.